All rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court of the 2nd District is now open. Pursuant to adjournment, the Honorable Anne Brackley and Jordan Simpson-Zachary. Good morning. Please be seated. Your Honors, first case of the morning, fall 2-12-0-8-2. Henry of the Estate of Valerie Smith. On behalf of the Avalanche, Mr. Timothy J. Storm. On behalf of the Ecolese, Mr. Mitchell Feinberg. Both sides ready to proceed? Yes, Your Honor. Then you may proceed when you're ready. May it please the Court. Your Honors, Timothy Storm on behalf of the Appellant, Janice Smith. The Court, I know, is familiar with the facts of the case. So you know that the dispute centers on the effect of a premarital agreement on the disposition of property of the intestate estate of Alfred Smith. If the premarital agreement at issue is invalid, Janice Smith will receive the spouse's share of the estate. If the premarital agreement is valid, she will receive a lesser amount or nothing of the disputed assets.  We've raised two categories of legal errors with respect to the decision below. First, Sarah and Lance, Al Smith's children, brought a declaratory action in which they relied upon the premarital agreement. As the plaintiffs in that action, it was their burden to produce and prove the entire contents of the premarital agreement. They did not do so. The record shows that they produced only a part of the premarital agreement. Your point is that because they didn't produce the will, correct? They did not produce two of the four exhibits to the premarital agreement, the two exhibits being the wills of Alfred Smith and Janice Smith, or copies of those wills. So the corollary of that is your position that the premarital agreement is unenforceable because the will's missing? Not exactly, but close. Our position is that the premarital agreement is unenforceable because it is not complete. The premarital agreement, the seven-page document called the premarital agreement, specifically refers to exhibits C and D, those are the two copies of the wills, three times. Those documents have never been produced. What has been produced instead is a premarital agreement with only two of the four exhibits. Does the premarital agreement itself contain language that in the absence of these documents it's unenforceable or there's no consideration? Why can't it stand alone, in other words? Yes, in two respects. One is the premarital agreement indicates that the parties' agreement not to contest the wills, each other's wills, stand as consideration for the premarital agreement. But you don't need consideration for a premarital agreement. In this particular case, the premarital agreement specifically sets out that this is consideration. Isn't that just gratuitous, though? It's not required. I believe Your Honor is referring to case law that says the agreement to marry is significant. Well, and the statute. Is sufficient consideration, and the statute, is sufficient consideration for a premarital agreement. We do not dispute that. In fact, we've cited that and agreed with that in our brief. What we have said is in this particular case, where the parties specifically denominated certain consideration over and above that, that consideration has to be taken as dispositive for purposes of this agreement. In other words, they have chosen. This agreement's different because they put it in there. Therefore, we have to include that in the consideration of the, no pun intended, but consideration of the entire document. Is that your point? That's essentially the argument. Yes, Your Honor. Your client provided Sarah and Lance with a copy of the premarital agreement. That's correct. But not the wills. My client could not find the wills. She produced in discovery exactly what she says she found, which was the seven-page premarital agreement plus two exhibits, A and B. C and D, my client did not find and doesn't know where they are. I'm sorry. I was answering Justice Hudson's question, and there's a part two, but if you have. The question I have, the fact that the, how do you respond to the argument that the premarital agreement expressly allowed Alford, as I read it, to alter his wills any time? Does that establish that the will is an essential to the contract between the parties? No, Your Honor. Your premise, I believe, is correct, that Alford could alter his will at any time. But as we've said consistently, and I have to admit repeatedly during this case, we're not relying on exhibits C and D as wills, as probatable documents for disposition of property. We're relying on those as exhibits to the agreement for whatever purpose they may be used. And this is not my idea or the court's idea or anybody else's idea. Except the parties to the agreement who specifically told us this agreement has, let's say, five parts. The seven-page premarital agreement plus four exhibits. Two of those exhibits aren't here. We don't have them. And so what the court is being asked to construe is not the agreement that the parties entered into. It is only a part of that agreement. Now, the fact that these two exhibits happen to be wills, and I hope we've made this clear. I'll make it in the briefing. I'll make it clear again here. The fact that they are or are not wills is not the dispositive point. We are not relying on them as instruments of testamentary disposition that could be probated. And let me take that one step further to make that point clear if I can. In this situation, we have two exhibits that are missing, C and D, and those are supposedly the wills or copies of the wills of Alford and Janice Smith. But let's say that we have all the facts that we have in this case, but we go and change one element of it, which is instead of missing, these two exhibits are there, or at least the will of Alford Smith is there, and written in big red letters on the first page of it is the word revoked, signed by Alford E. Smith. Would I take a different position here? Would I say it doesn't matter that that document is there or it's not there? No. I would take exactly the same position that I'm taking here because the point we are trying to make is not that we are missing a probatable will. The point that we are trying to make is that we are missing what the parties themselves told us is a part of their agreement. And to attempt to construe that agreement while missing two-fifths of it, two of the exhibits, is incorrect. It's an incomplete agreement, and the law offers it very clearly. So where does that leave you? What's the bottom line position? The bottom line position is if we have an agreement that is not the full agreement of the parties, the court cannot construe it, it is not complete, it is not enforceable. That's what the law tells us. An agreement of the parties that is not complete cannot be enforced and construed. Well, but again, you said that he could alter it, he could revoke it. So why doesn't that leave the agreement standing without the necessity of having these documents? If I understand your question correctly, please tell me if I'm not meeting your question. I think the difference is between looking at those exhibits as instruments of testamentary disposition, a will, versus pieces of paper that are attached to these documents. From our point of view, we're not seeking to probate these now missing wills, or Alfred's missing wills. No, but you're saying you have to have them to adequately and correctly construe the entire agreement. With respect, Your Honor, I'm not. That's what the parties have told us. The parties referenced in three different parts of the seven-page premarital agreement these exhibits, C and D. It's the parties that are telling us this is part of their agreement. It's the parties that are telling us this is essential to understanding what their agreement was. And we even have further evidence in the record of that. Outside of the agreement itself, if you want to go outside of the agreement, Janice specifically testified it was her understanding that these documents, C and D, were part and parcel of the premarital agreement, all part of the same transaction. Alfred Smith's lawyer who drafted the premarital agreement and who drafted Alfred's will said unambiguously it was Alfred's intention that all of these documents work together, that they not stand in separate parts. That was his intent at the time the premarital agreement was signed, correct? Correct. But how do we get around the fact that that agreement, four corners of that agreement said, I can take back anything that may be written in exhibit C or D at any time? I think Let's not call them a will, let's say it's a letter. Yeah. And the premarital agreement says I can take back anything I wrote in that letter, I can change that letter, I can do anything I want. I can rip it off the back of the agreement. Nothing in the agreement says then the agreement is not enforceable. Or if I pull those letters or documents off the back of this agreement, that that in some way taints the rest of this agreement. I mean, how do you get around the language saying I can change this? I can't change this piece, but I can change everything else that's attached to it. Well, I don't know if it's a matter of getting around it, but I would suggest that the approach that the court should take and the approach that the trial court should have taken is this. It's true that under the terms of the seven page premarital agreement that we have in front of us, So if you can write it legally irrelevant, then why is it necessary to have it? Well, as I was suggesting, he could change the legal effect of that will, change the testamentary disposition. But that's a legal effect. That doesn't make the paper itself evaporate. What's its relevance then? Its relevance is what the parties told us it was in paragraphs three, five and seven. At the time they signed it. Correct. But it seems to me that agreement left the door wide open to amend it at any time on any whim. He could amend that agreement by taking the exhibits away or changing those exhibits. And if they're gone, we have to presume that they were removed by the parties to the marital agreement. Well, I'm not sure that we do have to presume that, Your Honor. I understand that under the law, there are presumptions relating to the legal effect of testamentary disposition documents. But that's not what we're talking about here. I know that. I get that. The first couple of times you said that, I understand that's your point. I just don't know how you reconcile that with a portion of the original agreement that says, I don't need to have that. That may have, and I think what you're trying to say is that was indicative of the intent at the time it was signed. The time the agreement was signed. Yes, and not only that, we don't have any evidence, any evidence in this record that that intent ever changed. Who was in possession of the marital agreement? As far as the record discloses, the premarital agreement was sitting in a file in a drawer in a desk in the marital home of Janice and Al Smith. Janice Smith is the only one who can tell us those things. That's her recollection. Assuming that the, if you assume the agreement is enforceable, talk about the BMW. Thank you, Your Honor. I was about to move on to Part 2 because I think we've spent a fair amount of time on Part 1. Part 2 of the argument is, as Your Honor points out, if we assume that the premarital agreement is enforceable and construable as it currently stands before the court, or if the court so rules, there are four assets that are at dispute here. Two pieces of real estate, one in Wakanda, one in Elmendale, Florida, and a life insurance policy from Aetna, and a car, BMW. Your Honor asked me about the car first, so I'll address the car first. There was in the list of assets attached to the premarital agreement a BMW list. I think the record is absolutely undisputed. It was a 2003 BMW. That's not right. That's not the same car that we're talking about now. So where did the car that we're talking about now come from? Trade-in of the 2003 BMW, plus joint assets of Janice and Alfred, and then the monthly payments. There was a loan on it. The monthly payments on the loan were made out of the couple's joint bank account. Now, with respect to every asset in dispute here except the car, the trial court said we have to look at the language of the premarital agreement to determine how they will be distributed. The athlete in the trial court and the trial court itself made an exception with respect to the car. It didn't say we're going to look at the terms of the premarital agreement. It said we're going to look at the title holder of the car. It said the title holder of the car is Alfred Smith. That's dispositive. But the 2008 BMW that we're talking about here falls under the provisions of Paragraph 8 of the premarital agreement, which talks about what happens if there is, I'll use the term commingling, although that's not the term that's used in the premarital agreement, if there are some marital assets, some separate assets used to purchase an asset. And the fair reading of that Paragraph 8, which I won't take the time to quote to the court unless you wish me to, is that the 2008 BMW was partially acquired with Alfred's nonmarital property, in that it was acquired in exchange for or with the proceeds of his nonmarital property, and partly with marital property, in that it was acquired during the marriage. And these are terms of art, technical terms that are used in the agreement. The court should have apportioned the value of the BMW based upon the contributions of marital and nonmarital assets. I have one additional question. What's the difference between, from your perspective, cash value of a life insurance policy versus the death benefit? As Your Honor may suspect, I looked into that with some diligence, and I'm sure the other side did as well. I haven't found documents in the record of this case or case law that is quite as clear as I would like it to be on that point. But I can say that we did find case law, which I've cited in the brief, that indicates cash value and death benefits are legally distinct aspects of a life insurance policy. The reason that's important in this case, Your Honor, is because the asset list that was attached to the primary benefit. I understand why it's important. My question is, what's the difference? Well, to not put too fine a point on it, the key difference is the life and death of Alfred Smith. Alfred Smith was not entitled to a death benefit during the course of his life on his life insurance policy, obviously. The death benefit came into existence only, I should say there was an entitlement to a death benefit, only upon the death of Alfred Smith. The only asset that's mentioned in the premarital agreement is the cash value of that life insurance policy. The cash value, we agree, was a nonmarital and it was noted in the agreement. Isn't that then what is transformed into death benefits, for lack of a better way to describe it, upon his death? I don't think so. I don't think there's anything in the agreement that tells us that or anything in the definition of cash value and death benefit that tells us that. Because cash value and death benefits, while they relate to the same insurance policy, are legally distinct entitlements within that contract of insurance. Only one of which was mentioned in the premarital agreement. Were there premiums paid on that policy after the marriage? The policy that we're referring to was essentially employee benefit of Alfred Smith as an employee of Discover Card. So it was paid for by his employer, is that the idea? Well, maybe. The answer is I don't know the exact answer to your question. I don't think it's reflected in the record. What I do know is that it is part of his employee benefits and presumably paid for that way, but I couldn't cite you to a page that says that. And he worked for that company after the marriage, correct? Before and during, yes. Before and during, okay. If there are no further questions, it appears that my time has expired. Thank you. Okay. Counsel? May it please the Court, Your Honors. My name is Mitchell Feinberg and I represent Sarah and Lance Smith who are two of the three children of the decedent, Alfred Smith. In preparing for this oral argument, Your Honors, I asked one of my associates who's worked on this file since the beginning, really what is the one key thing that comes to her mind when she thinks about what one should remember with this case? And what she told me was, and she pointed out, let's look at the terms of the premarital agreement itself because really that's what's at issue here. And when we discussed it, we thought there were two main key parts to that premarital agreement that justify and explain why the lower court, the trial court, decided the way it did. And the first is that each of the two parties can dispose of their nonmarital assets in any way, in any way that they chose, without interference from the other side. The second part that was key to the facts of this particular case is obviously the missing wills. And it was clear in the premarital agreement itself that the wills could be amended, altered, in any way that either of the parties chose to do so. And so the fact that they could change any provisions will make the wills unimportant to the actual terms of the contract. The contract, the premarital agreement is a contract, and to be interpreted and enforced and reviewed as a contract were both parties signed an agreement as to what to do with their assets in the event of death or divorce. They didn't divorce, but Alfred unfortunately passed away. And in this agreement, either party can do whatever they wanted with their assets. They could make a will, they could make a trust, a land trust. In fact, either party could give joint assets to the other party. Well, they could revoke their wills. They could revoke their wills. We asked him a series of questions on that, and his response was yes. He tacitly or expressly acknowledged that was true. But did you hear his response, well, that doesn't answer the question that the parties contemplated from day one that all these agreements would have to be there and read together to discern their intent. So how do you respond to his response? Well, the short answer is I don't agree with that. But to expand upon that, if you could take, first of all, the will is signed by one party. It's ambulatory. It could be changed at any point in time by either person. There was nothing in this premarital agreement that says either party is to make an irrevocable will. I've seen a couple of those. Or this isn't a joint and mutual will where you need both people to agree to change it. There's very few, but there are a couple of situations where you get a husband and wife and they sign a will, and it's a joint and mutual will, and it can't be revoked, especially when one party dies, but it can't be revoked without both of them revoking it. The premarital agreement could have been amended by both of them changing it in a postmarital agreement. But this agreement says that either one could amend the document, alter the document, change the document any way that they wanted to. The will, and it specifically said the will is not to considerate. One of their arguments is the will is consideration for the premarital agreement. And I don't know how one can come to that conclusion when the premarital agreement that's signed by both parties says the will is not consideration. And I've owned that in many of my briefs and petitions before the probate court. So with Illinois law, it's crystal clear that you cannot probate something that doesn't exist. You have intestate succession. And in this particular premarital agreement, they actually make a bunch of provisions in the very beginning in paragraph 2 as to what happens if they die without a will. So how could this document be critical if on the one hand it says that it's not consideration, you can change it any way you want, and there's a whole half a page on page 3 that says what happens if one dies without a will, and that is the other party gives up their right to a widow's award, intestate succession, descent, inheritance. So is that what you're saying in your brief, the premarital agreement sort of contemplated intestacy? Absolutely. Were you involved in preparing the premarital agreement? No. I didn't meet. No. What got us to this point was when Alfred Smith passed away, I was hired by two of the three children of the decedent. I think at the time one of them was a minor who has since become an adult. And we couldn't, the children weren't able to, they filed a petition to have one of them become the administrator. The spouse was able to have preference because this was intestate. And the state was open. It became supervised administration because quite admittedly there's distrust between the two parties where it wouldn't be here. And it took from there about four months to get an inventory. And what it's telling us is that there was an inventory of probate assets and there was an inventory of non-probate assets. And what caused the petition for declaratory relief is that in one of the inventories, I believe it was the probate inventory, it listed that there was a life estate in favor of the surviving spouse and two real estate properties. And at that point we didn't have a premarital agreement. There wasn't discovery yet. We didn't have a will, and so we were unable to figure out why there would be a life estate without seeing the premarital agreement, without seeing the will, without seeing the trust. And the deed was in just the decedent's name alone. So that's the genesis of the declaratory action to have the probate court decide who gets what of those five properties. There were about a dozen other properties that were in joint tenancy or had a TOD, a transfer of beneficiary designation, and telling the children, following the terms of the premarital agreement, which allows either party to dispose of the property any way they want subsequent to the marriage. And the fact, the point I'm getting to is it's quite telling that Alfred Smith, after he was married, took about ten of his assets, and I'm estimating the numbers, and put his spouse as the beneficiary or made him joint. And those assets, which total over $400,000, the kids haven't contested. She has those assets. They've never been in dispute. And what that tells you is he knew what the terms of this premarital agreement said, and if he wanted to add his spouse, he could have easily just prepared, had his lawyer or himself prepare a deed or a land trust or some other mechanism to add her to the property, add her jointly to it, like he did with these other properties, and that wasn't done. So this wasn't someone who was ignorant as to what he could do or should do if he wanted to add a joint tenant. And he was in his third marriage and created a premarital agreement because he wanted it honored. In the event of divorce, he wanted to protect his assets because one would presume he had to give away a fair portion of at least his own assets or at least marital assets twice before. And so this agreement was made with the full intention of it being honored. And he, while he, at the time he was getting married, had a will, at the time that he passed away, it's not disputed that he died in testing. No one has even come up with a signed copy of the will. There's absolutely no testimony that someone saw a will after he died that was signed and now it's lost. No one can find a signed copy of a will at any point in time. Counsel, paragraph 5 of the premarital agreement contains some interesting language. I want to get your interpretation. It states, Alfred may make any provisions he wishes with respect to his non-marital financial assets, townhouse, condominium, in his will. So does that foreclose a disposition of those assets without a will? How do you make, what do you make of the language in his will? Yes, Judge. It says that he can make any provisions he wants. If, in fact, he doesn't, I think what he was trying to do is he's saying right now the preceding sentences certainly impact that sentence alone. And he's saying presently I have a life estate for the benefit of my spouse in this will. And I think what he was trying to, what this document is trying to get across is that he could alter this in any way that he wants. And so the fact that... In his will, is that a little bit of a loose language there? What do we make of that? It could be loose language. I don't, you know, one can't obviously speak to Alfred Smith. We have the Dead Man's Act. And so any of the testimony by the surviving spouse as to what may have been discussed at that time wouldn't be evidence anyhow. Well, the clear indication is it's a reference to what his present intent was at the time he signed the prenup, correct? That's the position. And the way that I would read this, that's correct. There's ten different spots in this document that says he can do whatever he wants with his non-marital assets. He listed his non-marital assets. She listed hers. And there was a disclosure. And in a few minutes I'll get to some of the questions as to the specific assets like the insurance and the car that was asked. But I believe that without a document that gives her a life estate or any other interest in the real estate, he died in test date. And the real estate, the deeds were 100% undisputed and clear that they were in his name. They were never changed. They were his properties going into the marriage. And what this agreement says is I want to be able to control the disposition of where I live and my two properties after I die. Or I don't know that he was thinking about dying, but really in the event of divorce. So it was clear that his intention was that he can do whatever he wants with his property because he was one would assume that people do premarital agreements mostly to plan for a divorce, but you always include provisions in the event of passing. And the event of passing in these documents, and it's clear from his because it's written in about five different ways, is that the wills were not consideration. He could do whatever he wants with his assets in any way, shape or form. So in summary, your argument is that the validity of the premarital agreement does not stand or fall on the presence of the will. 100%. What about honing in on the BMW? The argument appears to be that the 2008 BMW is only partially Alfred's non-marital because it was acquired in exchange for the 2003 BMW. What's your argument on that? Well, a couple of things. First of all, the title with the secretary of state to this BMW was an Alfred to name alone. So it's a probate asset. So the terms of the premarital agreement should control the disposition of this 2008 BMW. It is correct that at the time of the premarital agreement, he owned a 2003 BMW. There's a paragraph in this agreement, paragraph eight on page four, that says during the course of the marriage, all property acquired by each party in the proceeds of non-marital property shall be deemed to be part of their non-marital estate. So it's typical that if they're married a long time, he's not going to have a 20-year-old car. But if he buys a new car with the proceeds of the old car, that is his asset. Now, if he had a loan on that property, that doesn't change the fact that he used non-marital assets to up his car by five years and get a new car. Okay, so we have the exchange of the car. That's understandable. Was there some funds used from him and Janice's joint checking account? Does that come into the mix here? I don't know. I don't know that there was any presentation factually of what assets were used to pay down whatever loans were on the car. I think that was on the record. Pardon me? I think that's in the record. If it's in the record, then I would argue in this court that the trial court made a finding that it is a probate asset and that the car belongs to the probate estate. Any finding that it doesn't belong to the estate and thus to the children because she waived her rights to any non-marital assets, this court would have to have a finding that it would be against the manifest weight of the evidence because the trial court is the one that heard those factual arguments. The paragraph 8 says what again? What is paragraph 8? During the course of the marriage, all property acquired by each party in exchange for or with the proceeds of any non-marital property, the 2003 BMW, shall be deemed to be part of their non-marital estate in the terms hereof. Each party waives or relinquishes all claim to the non-marital estate of the other. That's paragraph 8 on page 4 of the paragraph 8. Right, but here the 2008 was about a $47,000 car. They turned in the other one, got a $10,000 credit or trade-in value, whatever you want to call it. That leaves quite a gap. And so your position is if I take a dollar of non-marital property and buy a McMansion, that that now becomes non-marital property even though marital property is used to pay for it, pay the mortgage, pay the taxes. Is that basically your position? That's not my position. My position is that when he purchased the car, if it was a $47,000 car and he put $10,000 into it and titled it in his own name, it was his intention to keep it as separate non-marital property. If once you take that car, that $47,000 car, and you drive it 10 feet off the lot, it's not worth $47,000 anymore. But let's assume it's worth more than $10,000. I would assume that it's worth more than $10,000. Regardless of that, we don't, if he used his earnings or other, we don't know if he used other non-marital assets. I think the record does show that it was a joint account from which those payments were made. How do you find that that's not partially marital property? My position would be that subsequent or upon his death, the car may have a certain value. Whatever that value is, he still kept the car titled in his own name. If there's some value left to this car after, and by the way, the surviving spouse without court permission, this was a probate asset, drove it for one or two years after that, which probably also decreased its value. Outside the record. Interesting point, but outside the record. I apologize. But in any event, that... Your position is paragraph 8 controls notwithstanding the ostensible inequity of the situation. Is that sort of what you're saying? Well, I don't know if it's equitable or inequitable. It was a car that he had, he purchased with his own funds, and it should be separate non-marital property because it was another car purchased with the proceeds of the 2003 car. That would be our position. He should have had a car clause. Right. When you have a five- or six-page premarital agreement, it's hard to include everything, but I think the clear intention was what's mine and stays as separate property is mine. If I want to add a joint tenant to it, then I can. And the same went for the wife. She could do whatever she wants with her non-marital assets, and it was pretty clear that they kept separate. But your position is because he used the proceeds from the 2003 car, that made the 2008 car non-marital, regardless of whether marital funds were used to support that car and pay for the rest of it. To subsequently pay down whatever loans were on that car. Okay. Can you briefly address the cash value versus benefits? Yeah. Yes, Your Honor. First of all, Paragraph 10 of the trial course finding, September 15, 2011, states – oh, I'm sorry, that dealt with the car. I apologize. The cash value of the life insurance, it was a policy that was listed on the disclosure of assets between husband and wife, or on the husband's assets, which I believe was Exhibit A or B, whichever one it was. And obviously there wasn't a death benefit at that time because he was still alive. So all he was doing in that disclosure is disclosing the fact that he had a life insurance policy. He could have listed the life insurance policy, policy 1, 2, 3, 4, and put no value or put in kind or whatever he would want to put. But he even went further and disclosed that right now there's a cash value. Probably thinking that if I got divorced, I don't want to give up my cash value on that policy. And if I died, I'd listed the policy and whatever the death benefit may be at that point. I don't know if it was a variable policy. I believe it was. So you couldn't list a death benefit because – Why didn't it technically exist at that point? Well, the policy existed and the benefit was unknown as to what the amount would be when somebody passes away. When you have a cash value to a policy, the larger the cash value becomes. Oftentimes with these variable policies, the death benefit could increase. So if he listed a death benefit of X amount of dollars – It would be illusory. It would be inaccurate. So in essence, are you saying that the cash value benefit transmuted into the death benefit upon his death? Is that basically what you're saying? Which is not the same asset. Exactly, and the main point is that he disclosed that there was a policy. The issue would be if there was some magic – or some magic – some unknown or hidden policy – That he never disclosed. That he never disclosed or had a million-dollar cash value and never disclosed his assets properly, then one could say she didn't know the bargain that she was getting into in listing the assets. And so the point is he disclosed all the assets to the best that he could at the time of the signing of the document. At that point, that was what the cash value was. So the fact that he listed a cash value probably goes farther than 9 out of 10 premarital agreements to begin with. All right. Thank you, Your Honor. Any other questions? Thank you. Thank you, Your Honor. Thank you for your time. Do you wish to reply? Yes, Your Honor. Let me use the brief time that I have to highlight three parts of the premarital agreement. First, with respect to the necessity of Exhibit C and D, Paragraph 3 of the premarital agreement says, The parties have each executed a last will and testament, copies of which are attached here to as Exhibit C and D. The parties agree that these wills are in conformity with the provisions of this agreement, and as consideration for this agreement, each party does hereby waive any and all objection to the terms of said last will and testament of the other, and each party agrees not to contest or renounce the terms thereof. Likewise, each party agrees not to contest or renounce any future wills or codicils which are in conformity with the terms of this agreement. Counsel just said moments ago, nobody has ever seen these executed wills. What counsel has just told us is, nobody has ever seen consideration for the premarital agreement under Paragraph 3. Paragraph 5 says, The husband's will, among other things, grants the wife substantial nonmarital assets and the right to reside in his nonmarital townhouse and condominium until her death or remarriage. These will provisions are not in any way consideration for this premarital agreement. While the husband has no present intention to change these provisions of his will, the husband is free, by terms of the premarital agreement, to alter his will with regard to any of these nonmarital property if he elects. Counsel refers to this as loose language, but it's very specific, precise language. Alter his will, not revoke his will, not rip it off the back of some other document and pretend that it didn't exist, but alter his will. Alter would not, that would not include revoke? Alter is a different word than revoke. If he wanted to say revoke, he could say revoke. Alter means to change, not to eliminate. And here it specifically says alter his will with respect to, with regard to any of his nonmarital property. We don't have any evidence that he ever did so, and besides that, Your Honor, if he, if we're assuming that the absence of Exhibits C and D necessarily means that Al Smith revoked his will, if that's what we draw from that, then he must have revoked Janice's will too, because it's not there either. What we're dealing with here is not revoked wills, it's two missing exhibits. He couldn't have revoked her will, and there's no evidence whatsoever that he revoked his. Let's ask a final perhaps mundane question, but if you are alleging the necessity of having the will there as accurately construing the intent of parties on the premarital agreement, whose obligation is it to produce the will? It's the obligation of the plaintiff in the declaratory judgment action. That's the appellate. The plaintiff bears the burden of proof. One final point, Paragraph 8 of the premarital agreement. This is with respect to the disposition of the car. Counsel, very interestingly, read almost all of Paragraph 8, but he left out the final sentence for some reason, which says, likewise, all property acquired during the marriage shall be deemed to be marital property. Well, that's the car. That's the BMW. We can see that it was acquired partially with his non-marital property, but it was acquired during the marriage, partly with marital property, and it should at least be apportioned based upon those values. If there are no questions, Your Honor, thank you very much. Gentlemen, then, thank you both very much. We'll be in recess until 9 p.m.